

**IN THE**
**TENTH COURT OF APPEALS**

No. 10-20-00158-CV

**IN THE INTEREST OF Z.C., A CHILD**

**From the 272nd District Court**
**Brazos County, Texas**
**Trial Court No. 19-000457-CV-272**

**MEMORANDUM OPINION**

Tomalesha C. appeals from a judgment that terminated her parental rights to her child, Z.C. Tomalesha complains that the evidence was legally and factually insufficient for the trial court to have found that she committed the predicate acts set forth in Section 161.001(b)(1)(D), (E), and (O) and factually insufficient for the trial court to have found that termination was in the best interest of the child. Because we find that the evidence was legally and factually sufficient as to Section 161.001(b)(1)(E) and factually sufficient as to best interest, we affirm the judgment of the trial court.

STANDARD OF REVIEW

The standards of review for legal and factual sufficiency in termination cases are well established. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). In reviewing the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id*.

FAMILY CODE SECTION 161.001(b)(1)

In her first and second issues, Tomalesha complains that the evidence was legally and factually insufficient for the trial court to have found that she committed the predicate acts set forth in Family Code Section 161.001(b)(1)(D), (E), or (O). TEX. FAM. CODE ANN. §161.001(b)(1)(D), (E), (O). Because we are required to consider the sufficiency

of the evidence pursuant to Sections 161.001(b)(1)(D) or (E) if challenged, we will address one of those grounds first. *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to that ground, it will not be necessary to address the other predicate grounds because sufficient evidence as to only one ground in addition to the best interest finding is necessary to affirm a termination judgment. *Id.* at 232-33.

Section 161.001(b)(1)(E) of the Family Code provides that a parent's rights may be terminated if it is found by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). To "endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Under Section 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the result of the parent's conduct, which includes acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533. In making this determination, a factfinder court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex.

2009). A parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

In our endangerment analysis, drug use may constitute evidence of endangerment. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Domestic violence and a propensity for violence may also constitute evidence of endangerment. *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Finally, we may consider Tomalesha's failure to complete her service plan in determining whether her conduct risks endangering the child. *In re M.R.*, 243 S.W.3d 807, 818 (Tex. App.—Fort Worth 2007, no pet.).

RELEVANT FACTS

In 2015, Tomalesha came into the care of the Department at age 15 after her mother refused to pick her up after Tomalesha had been detained for threatening a law enforcement officer. During the years that followed until she aged out of foster care, Tomalesha was placed in and unsuccessfully discharged from many residential treatment centers and hospitals due to her aggressive and violent behaviors toward others and herself. Tomalesha was eventually sent to Colorado in a fictive kin placement where

Tomalesha ran away multiple times. Tomalesha was sexually involved with at least two adult men who were years older than her and was allegedly sexually trafficked by at least one of the men who was allegedly involved in a gang. Tomalesha got pregnant twice during the 11 months she spent in Colorado. The first was terminated by abortion, and the second was with Z.C., with whom she was pregnant when she returned to Texas. The Department had to move Tomalesha from Colorado in the middle of the night because of threats one of the men, nicknamed "Monty," had made against her and the woman with whom she was placed in Colorado. Even after that, Tomalesha remained in contact with Monty throughout the proceedings.

Upon returning to Texas, Tomalesha's aggressive behaviors continued with more unsuccessful hospital and residential treatment center placements. Tomalesha left a placement for pregnant teens after a week because she did not like their cell phone policy. She was placed with another fictive kin but was removed at the request of both Tomalesha and the fictive kin after a month. Tomalesha was placed with another fictive kin that the Department did not approve where she remained until Z.C.'s removal.

Initially, Tomalesha seemed to do well in the last placement. When Z.C. was approximately two months old, he was diagnosed with club feet, which required substantial and precise medical care, and Tomalesha was very involved in his medical care early on. Tomalesha's caseworker would transport Z.C. and Tomalesha to his medical appointments and assisted her as much as possible.

Christopher, an adult male who was on probation for possession of marijuana, started residing in Tomalesha's bedroom at the placement. Tomalesha claimed that he assaulted her several times and sexually assaulted her once during that time but she refused to make him leave.

Because the placement was becoming unstable, the Department found a foster care home that was going to take both Tomalesha and Z.C., but Tomalesha refused to go because she wanted to remain near Christopher. While transporting Tomalesha and Z.C. to an appointment, the caseworker discovered that Tomalesha had failed to get a prescription filled for Z.C. for a yeast infection for five days because she had either lost it or it had been improperly filled out and Tomalesha had not attempted to get it replaced. Tomalesha also told the caseworker that she was not leaving Christopher and threatened to run away to Colorado with Z.C. if the Department attempted to interfere. The caseworker also noted that Z.C.'s diaper bag smelled like marijuana. Tomalesha claimed that her fictive kin was smoking marijuana in the home and that she begged the caseworker to move her, although the caseworker did not agree with this.

The fictive kin called the caseworker to let her know that she had kicked Christopher out of the house but that Tomalesha had packed up all of Z.C.'s belongings and left with Z.C. Tomalesha had also made a Facebook post immediately prior that was construed as a suicide threat. The caseworker immediately called Tomalesha who met the caseworker back at the placement. Tomalesha denied that she was going to harm

herself or Z.C. It was then discovered that Tomalesha was not taking her anti-anxiety medication. After this, Z.C. was removed from Tomalesha. Z.C. tested positive for marijuana after he was removed.

After his removal, Tomalesha was ordered to complete a service plan which, in part, required her to complete a psychological evaluation, to participate in drug tests, to attend counseling, and to maintain a stable home and employment. Tomalesha's psychological evaluation was largely invalid due to inconsistent answers and deception. Tomalesha refused to acknowledge that she had any mental health issues but did admit to multiple suicide attempts from the age of 11. The doctor was extremely concerned about Tomalesha's refusal to acknowledge any mental health issues and the risk of child abuse found during the testing.

Tomalesha was assigned to two counselors by the Department early in the case but Tomalesha attended only one session with one of them and refused to attend again. Approximately three months before the termination trial in January, Tomalesha found a counselor on her own and attended three sessions with him in November and December before she stopped communicating with the third counselor altogether.

After Z.C.'s removal in February, Tomalesha did not have a residence but moved from couch to couch with friends until her Colorado fictive kin assisted her with getting an apartment in November. She also got a job in November at IHOP which she quit to

take another job in December. She provided pay stubs from only the IHOP job to the Department.

Tomalesha refused to take two drug screens later in the case because she had braids in her hair. After the first refusal, the caseworker informed Tomalesha that another test would be coming and not to have braids at that time but Tomalesha got braids again and refused to be tested because of them, which resulted in two presumed positive drug tests.

ANALYSIS

When we consider all of Tomalesha's long-standing mental health and anger issues toward herself and others, which had been consistent throughout the Department's involvement with her, her refusal to disassociate herself from multiple adult men who she claimed were also physically and sexually violent toward her, and her overall instability taken with her refusal to be placed together with her son in foster placements which were safe and appropriate or to acknowledge or address her mental health and anger issues before and after Z.C.'s removal, we find that the evidence was legally and factually sufficient for the trial court to have found that Tomalesha "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Because we have found that the evidence was legally and factually

sufficient as to Section 161.001(b)(1)(E), we do not address the sufficiency of the evidence as to subsections (D) or (O). We overrule issues one and two.

**BEST INTEREST**

In her third issue, Tomalesha complains that the evidence was factually insufficient for the trial court to have found that termination was in the best interest of the child. In determining the best interest of a child, a number of factors have been consistently considered which were set out in the Texas Supreme Court's opinion, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply indicates factors that have been or could be pertinent in the best interest determination. *Id*. There is no requirement that all of these factors must be proved as a condition precedent to parental termination, and the absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence establishing one of the predicate grounds under section 161.001(b)(1) also may be relevant to determining the best interest of the children. *See C.H.*, 89 S.W.3d at 27-28.

Z.C. is too young to express his desires regarding best interest but does have significant health issues that will require strict monitoring and treatment to prevent regression and further surgeries. While Tomalesha showed that she was somewhat informed about Z.C.'s needs and treatment, her failure to fill a prescription for an unrelated issue shows a lack of concern for Z.C.'s overall health and physical well-being.

Additionally, it is questionable how diligent Tomalesha would be in maintaining doctor visits without the Department's assistance.

The evidence showed that Tomalesha put her needs and interests before that of her child by refusing to move with Z.C. to a safe placement, allowing Z.C.'s exposure to drugs and violence, refusing to acknowledge or address her mental health and anger issues, her self-harming behaviors, and prioritizing relationships with adult men who have assaulted her physically and sexually. In her brief to this Court, Tomalesha attempts to place the blame on the Department for what has transpired in her life since 2015; and perhaps to some degree that might be true. However, although unfortunate, what has happened to Tomalesha has occurred in large part because of her violent and unacceptable behavior and pattern of bad decisions that started before her involvement with the Department. Tomalesha's choices and actions both before and after Z.C.'s birth and after his later removal have demonstrated that the parent-child relationship between Z.C. and Tomalesha is not stable or safe for Z.C.

Additionally, Z.C. had been living with a foster parent for approximately five months at the time of the trial who was very involved in his medical care for his club feet and wanted to adopt him if the termination was granted. Z.C. was very bonded to his foster parent. This placement was safe and stable and Z.C. was receiving the strict medical care needed to prevent regression for his feet and for his other issues.

Viewing the evidence by the appropriate standards and considering the evidence in relation to the factors set forth in *Holley*, we find that the evidence was factually sufficient for the trial court to have found that termination was in the best interest of Z.C. We overrule issue three.

**CONCLUSION**

Having found no reversible error, we affirm the judgment of the trial court.

TOM GRAY
Chief Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Neill
Affirmed
Opinion delivered and filed December 16, 2020
CV06

